# GREEN ET AL. *v.* MANSOUR, DIRECTOR, MICHIGAN DEPARTMENT OF SOCIAL SERVICES

No. 84–6270. Argued October 7, 1985—Decided December 3, 1985

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and White, Powell, and O'Connor, JJ., joined. Brennan, J., filed a dissenting opinion, in which Marshall, Blackmun, and Stevens, JJ., joined, *post*, p. 74. Marshall, J., filed a dissenting opinion, in which Brennan and Stevens, JJ., joined, *post*, p. 79. Blackmun, J., filed a dissenting opinion, in which Brennan, Marshall, and Stevens, JJ., joined, *post*, p. 81.

*William Burnham* argued the cause for petitioners. With him on the briefs was *Paul D. Reingold.*

*Louis J. Caruso*, Solicitor General of Michigan, argued the cause for respondent. With him on the brief were *Thomas L. Casey, Erica Weiss Marsden*, and *Robert N. Rosenberg*, Assistant Attorneys General.

Justice Rehnquist delivered the opinion of the Court.

Petitioners brought two separate class actions in the United States District Court for the Eastern District of Michigan against respondent Director of the Michigan Department of Social Services, claiming that respondent's calculations of benefits under the federal Aid to Families With Dependent Children (AFDC) program violated certain provisions of that federal law. Before a final determination on the merits of either case could be made, Congress amended the relevant statutory provisions. It is undisputed that respondent's calculations thereafter have conformed to federal law. Notwithstanding this fact, petitioners claim that they were entitled to have the District Court award them both "notice relief" and a declaration that respondent's prior conduct violated federal law. The District Court denied petitioners both forms of relief, and the Court of Appeals for the Sixth Circuit affirmed. We now affirm the judgment of the Court of Appeals, holding that the Eleventh Amendment

to the United States Constitution and applicable principles governing the issuance of declaratory judgments forbid the award of either form of relief.

The two class actions involved in this case were brought on behalf of recipients of benefits disbursed under the AFDC program. See 42 U. S. C. §§ 601–615. The AFDC program uses a person's earned income in determining eligibility for, and the amount of, benefits. See § 602. The complaints alleged that certain of respondent's policies and regulations violated 42 U. S. C. § 1983 by inflating their respective class members' earned income and thereby causing a reduction or termination of AFDC benefits contrary to the applicable federal law.

One putative class challenged respondent's policy of prohibiting the deduction of child care costs in the calculation of earned income. While the case was pending in the District Court, Congress changed the relevant provisions of the AFDC program to expressly require participating States to deduct child care expenses up to a specified amount. Respondent thereafter brought state policy into compliance with this amendment and began deducting child care expenses in the calculation of earned income. There is no claim that respondent's current child care deduction policy violates federal law.

The other putative class challenged respondent's policy of automatically including stepparents' income in the calculation of earned income. The District Court issued a preliminary injunction preventing respondent from enforcing its automatic inclusion policy. But again, while the matter was pending on the merits, Congress amended the relevant section of the AFDC program to expressly require States to include stepparent income in the calculation of earned income. The parties thereafter stipulated that the District Court should terminate its preliminary injunction as of the effective date of the amendment. Here, too, there is no claim that respondent has not complied with federal law since that time.

The District Court granted respondent's motions to dismiss in each case. It held in each that the changes in federal law rendered moot the claims for prospective relief, and that the remaining claims for declaratory and notice relief related solely to past violations of federal law. Such retrospective relief, the court determined, is barred by the Eleventh Amendment.

The Court of Appeals affirmed in a consolidated appeal. *Banas* v. *Dempsey*, 742 F. 2d 277 (1984). It agreed that the changes in federal law rendered moot the claims for prospective relief. *Id.*, at 281–283. It also agreed that because the sought-after notice and declaratory relief was retrospective in nature, the relief was barred by *Edelman* v. *Jordan*, 415 U. S. 651 (1974). 742 F. 2d, at 286–288. It reasoned that when there is no prospective relief to which notice can be ancillary, even notice of the sort approved in *Quern* v. *Jordan*, 440 U. S. 332 (1979), cannot escape the Eleventh Amendment bar. 742 F. 2d, at 287–288. Declaratory relief is similarly barred under such circumstances, it explained, because such relief could relate solely to past violations of federal law. *Id.*, at 288.

We granted certiorari to resolve a conflict in the Circuits over whether federal courts may order the giving of notice of the sort approved in *Quern* v. *Jordan, supra*, or issue a declaratory judgment that state officials violated federal law in the past when there is no ongoing violation of federal law. The decision by the Court of Appeals in this case agrees with the result in *Colbeth* v. *Wilson*, 554 F. Supp. 539 (Vt. 1982), aff'd, 707 F. 2d 57 (CA2 1983) *(per curiam)*, but it conflicts with the decisions in *Appleyard* v. *Wallace*, 754 F. 2d 955, 959–963 (CA11 1985); *Randall* v. *Lukhard*, 729 F. 2d 966 (CA4) (en banc), cert. denied, 469 U. S. 872 (1984); *Beltran* v. *Myers*, 701 F. 2d 91, 94 (CA9) *(per curiam)*, cert. denied, 462 U. S. 1134 (1983); and *Silva* v. *Vowell*, 621 F. 2d 640, 650–654 (CA5 1980), which all allowed notice relief even though changes in state policy or federal law rendered moot

any claim for injunctive relief stopping ongoing violations of federal law. We now affirm the decision of the Court of Appeals.

The Eleventh Amendment confirms that "the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State School & Hospital v. Halderman*, 465 U. S. 89, 98 (1984). Because of the Eleventh Amendment, States may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity. *Id.*, at 99. The landmark case of *Ex parte Young*, 209 U. S. 123 (1908), created an exception to this general principle by asserting that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State. *Id.*, at 159–160. The theory of *Young* was that an unconstitutional statute is void, *id.*, at 159, and therefore does not "impart to [the official] any immunity from responsibility to the supreme authority of the United States." *Id.*, at 160. *Young* also held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law. *Id.*, at 155–156, 159. We have refused to extend the reasoning of *Young*, however, to claims for retrospective relief. See *Pennhurst, supra,* at 102–103; *Quern v. Jordan, supra,* at 337; *Edelman v. Jordan, supra,* at 668.

Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. See *Pennhurst, supra,* at 102. See also *Milliken v. Bradley*, 433 U. S. 267 (1977). But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment. Petitioners concede that any claim they might

have had for the specific type of injunctive relief approved in *Ex parte Young* was rendered moot by the amendments to the AFDC program. They nevertheless seek "notice relief" of the type approved in *Quern* v. *Jordan*, arguing that notice is an independent form of prospective relief protected against the Eleventh Amendment bar by *Ex parte Young*. In taking this position, we think petitioners misconceive our Eleventh Amendment jurisprudence and our decision in *Quern*.

*Quern* was the last chapter in the litigation that initially gave rise to *Edelman* v. *Jordan, supra*. The plaintiffs in that litigation challenged a State's administration of the federal-state program for Aid to the Aged, Blind, or Disabled (AABD). The District Court issued a declaratory judgment that current state regulations governing the administration of the program violated federal regulations then in effect.[1] It therefore permanently enjoined the state officials from continuing to violate federal law. Although the language of the declaratory judgment was no broader than necessary to complement the injunction against the current violation of federal law, it implied that the defendants had violated federal law in the past. The District Court therefore issued a second injunction ordering the defendants to release and remit all AABD benefits that they had wrongfully withheld on account of their past violations of federal law. The Court of Appeals affirmed, *Jordan* v. *Weaver*, 472 F. 2d 985 (CA7 1973), but we reversed, holding that the Eleventh Amendment barred the injunction ordering retroactive benefits because it was effectively an award of money damages for past

---

[1] The declaratory judgment was embodied in paragraph 4 of the District Court's judgment, which stated:

"Illinois Categorical Assistance Manual, Section 4004, and subsections thereunder, as applied to applicants for AABD are invalid insofar as they *are* inconsistent with the requirements of [federal law as construed in] paragraphs 1 and 2." *Jordan* v. *Weaver*, No. 71 C 70, p. 3 (ND Ill., Mar. 15, 1972) (emphasis added).

violations of federal law. *Edelman* v. *Jordan,* 451 U. S., at 666–669.

On remand, the District Court ordered the defendants to send notice to the plaintiff class informing individual class members that they were wrongfully denied benefits in a particular amount, together with a returnable form for filing claims with the appropriate state agency. The Court of Appeals reversed, holding that the District Court's proposed notice violated the Eleventh Amendment because it would effectively result in a federal adjudication of state liability for past violations of federal law. *Jordan* v. *Trainor,* 563 F. 2d 873, 875 (CA7 1977) (en banc). At the same time, the Court of Appeals determined that the Eleventh Amendment would not bar an order requiring state officials to send "a mere explanatory notice to applicants advising them that there is a state administrative procedure available if they desire to have the state determine whether or not they may be eligible for past benefits." *Ibid.*

We affirmed in *Quern* v. *Jordan,* 440 U. S. 332 (1979), holding that although *Edelman* v. *Jordan, supra,* retained continuing vitality after *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), see 440 U. S., at 338–345, the specific notice order approved by the Court of Appeals did not violate the Eleventh Amendment. *Id.,* at 346–349. We explained that the appellate court's particular notice order fell "on the *Ex parte Young* side of the Eleventh Amendment line rather than on the *Edelman* side." *Id.,* at 347. We reasoned that "unlike [the notice] ordered by the District Court, [this notice was] more properly viewed as ancillary to the prospective relief already ordered by the court," *id.,* at 349, and it did no more than "simply infor[m] class members that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures which they may wish to pursue." *Ibid.* We also stressed that the state defendants had not objected to the expense of providing

such notice, state agencies rather than federal courts would be the final arbiters of whether retroactive payments would be ordered, and the notice would not automatically lead to any particular action. *Id.*, at 347–348.

Our review of the long, drawn-out *Jordan* litigation convinces us that neither the Court of Appeals nor this Court conceived of the requested notice allowed in that case to be an independent form of relief. We simply held that the specific order fell within the *Ex parte Young* exception to the Eleventh Amendment principle of sovereign immunity because it was ancillary to a valid injunction previously granted and was sufficiently narrow to retain its character as a mere case-management device. The notice in *Quern* v. *Jordan* did nothing other than inform a diverse and partially victorious class concerning the extent of the judgment in its favor, cf. Fed. Rule Civ. Proc. 23(d)(2), and that the federal courts could do no more for them. There was no suggestion that the notice itself would bind state officials in any way, or that such notice would be routinely available as a form of relief in other cases. Because "notice relief" is not the type of remedy designed to prevent ongoing violations of federal law, the Eleventh Amendment limitation on the Art. III power of federal courts prevents them from ordering it as an independent form of relief.

Measured by the standards of *Quern*, however, a request for a limited notice order will escape the Eleventh Amendment bar if the notice is ancillary to the grant of some other appropriate relief that can be "noticed." Because there is no continuing violation of federal law to enjoin in this case, an injunction is not available. Therefore, notice cannot be justified as a mere case-management device that is ancillary to a judgment awarding valid prospective relief. Petitioners argue, however, that they are entitled to a declaratory judgment that respondent violated federal law in the past. Only if petitioners are correct in this assertion can they properly

claim a right to "notice" of a judgment under the principles of *Quern.*

The Declaratory Judgment Act of 1934, 28 U. S. C. § 2201, permits a federal court to declare the rights of a party whether or not further relief is or could be sought, and we have held that under this Act declaratory relief may be available even though an injunction is not. *Steffel* v. *Thompson,* 415 U. S. 452, 462 (1974). But we have also held that the declaratory judgment statute "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Public Service Comm'n* v. *Wycoff Co.,* 344 U. S. 237, 241 (1952). The propriety of issuing a declaratory judgment may depend upon equitable considerations, see *Samuels* v. *Mackell,* 401 U. S. 66, 73 (1971), and is also "informed by the teachings and experience concerning the functions and extent of federal judicial power." *Wycoff, supra,* at 243; cf. *Younger* v. *Harris,* 401 U. S. 37, 44–45 (1971).

In applying these principles, we have held that a declaratory judgment is not available in a number of instances. In *Great Lakes Co.* v. *Huffman,* 319 U. S. 293 (1943), we held that a declaratory judgment was not available to obtain a determination of the constitutionality of a state tax even though the relevant federal statute prohibited federal courts only from issuing injunctions against the collection of such taxes. *Id.,* at 299. We held in *Samuels* v. *Mackell, supra,* that a declaratory judgment declaring a state criminal statute unconstitutional was unavailable where it would have much the same effect as an injunction prohibiting enforcement of the statute, and the latter was barred by traditional principles of equity, comity, and federalism. *Id.,* at 69–73. In *Wycoff,* we held that it was inappropriate to issue a declaratory judgment deciding whether the plaintiff's business was interstate commerce and therefore potentially immune from state regulation. 344 U. S., at 244, 247–249. We reasoned that if the federal judgment were res judicata in subsequent

state proceedings, then the federal court will have lifted the case out of the state court before the state agency or court can hear it. *Id.*, at 247. On the other hand, if the federal judgment would not have such an effect, then it would "serv[e] no useful purpose as a final determination of rights." *Ibid.*

We think that these cases demonstrate the impropriety of the issuance of a declaratory judgment in this case. There is no claimed continuing violation of federal law, and therefore no occasion to issue an injunction. Nor can there be any threat of state officials violating the repealed law in the future. Cf. *Steffel* v. *Thompson, supra,* at 454. There is a dispute about the lawfulness of respondent's past actions, but the Eleventh Amendment would prohibit the award of money damages or restitution if that dispute were resolved in favor of petitioners. We think that the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed. But the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment. The teachings of *Huffman, Samuels,* and *Wycoff* are that a declaratory judgment is not available when the result would be a partial "end run" around our decision in *Edelman* v. *Jordan,* 415 U. S. 651 (1974).[2]

---

[2] If, of course, petitioners would make no claim that the federal declaratory judgment was res judicata in later commenced state proceedings, the declaratory judgment would serve no purpose whatever in resolving the remaining dispute between the parties, and is unavailable for that reason. *Wycoff,* 344 U. S., at 247.

JUSTICE BRENNAN's dissent contends that because the injunction and declaratory judgment in *Quern* implied past violations of federal law, declaratory judgments expressly adjudicating the question of past violations are routinely available. We think he is mistaken. The District Court's injunction and declaratory judgment against continuing and future violations of federal law in *Quern* implied that similar violations had occurred in the past because neither state nor federal policy had varied through the time of judgment. Here, by contrast, there are no present violations under the amended statute, and even if there were, an injunction against them would not imply that past practice violated the repealed federal law. Thus, a declaratory judgment that respondent violated federal law in the past would have to stand on its own feet as an appropriate exercise of federal jurisdiction in this case. This it cannot do for the reasons we have previously stated.

We hold that the District Court was correct in concluding that neither the "notice" proposed by petitioners nor a declaratory judgment should have issued in a case of this type. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Last Term, in my dissent in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 257 (1985), I explained at length my view that the Court's Eleventh Amendment doctrine "lacks a textual anchor [in the Constitution], a firm historical foundation, or a clear rationale." Today's decision demonstrates that the absence of a stable analytical structure underlying the Court's Eleventh Amendment jurisprudence produces inconsistent decisions.

In *Quern* v. *Jordan*, 440 U. S. 332 (1979), the State of Illinois contended that the notice relief ordered by the Court of Appeals, which was identical in all significant respects to

that requested in the instant case,[1] offended the Eleventh Amendment because "giving the proposed notice [would] lead inexorably to the payment of state funds for retroactive benefits and therefore it, in effect, amounts to a monetary award." *Id.*, at 347. JUSTICE REHNQUIST, writing for the Court, rejected that argument:

"[T]he chain of causation which petitioner seeks to establish is by no means unbroken; it contains numerous missing links, which can be supplied, if at all, only by the State and members of the plaintiff class and not by a federal court. The notice approved by the Court of Appeals simply apprises plaintiff class members of the existence of whatever administrative procedures may already be available under state law by which they may receive a determination of eligibility for past benefits. . . . The mere sending of that notice does not trigger the state administrative machinery. Whether a recipient of notice decides to take advantage of those available state procedures is left completely to the discretion of that particular class member; the federal court plays no role in that decision. And whether or not the class member will receive retroactive benefits rests entirely with the

---

[1] Green asked the District Court to order that notices be sent out to other AFDC recipients advising them of the outcome of the litigation, *i. e.*, of the declaratory judgment and telling them that state administrative proceedings might be available to them to obtain retroactive benefits. App. 132. Similarly, the notice approved in *Quern* v. *Jordan*, 440 U. S., at 349, "inform[ed] class members that their federal suit [was] at an end, that the federal court [could] provide them with no further relief, and that there [were] existing state administrative procedures which they may wish to pursue." The class members were " 'given no more . . . than what they would have gathered by sitting in the courtroom.' " *Ibid.*, quoting *Jordan* v. *Trainor*, 563 F. 2d 873, 877–878 (CA7 1977). And, of course, what class members would have gathered by sitting in the courtroom was the substantive outcome of the litigation—a declaration that Illinois officials had violated federal law.

State, its agencies, courts, and legislature, not with the federal court." *Id.*, at 347–348.

In the present case, the Court turns around and accepts the argument made by the State of Illinois in *Quern* with respect to Green's request for declaratory relief. JUSTICE REHNQUIST states that declaratory relief is barred by the Eleventh Amendment because

> "the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed. But the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being . . . prohibited by the Eleventh Amendment." *Ante*, at 73.

What the Court ignores is that the declaration by the District Court in the *Quern* litigation that Illinois officials had violated federal law, combined with the notice relief we sanctioned, would have yielded the same result.[2] The Court fails to explain adequately why declaratory relief should be analyzed differently than notice relief was in *Quern*, since use of the declaratory judgment in the State's courts is also left completely to the discretion of individual notice recipients and the award of retroactive benefits "rests entirely with the State, its agencies, courts, and legislature, not with the federal court." *Quern, supra,* at 348.

---

[2] It is not enough to distinguish the cases to observe that the notice relief in *Quern* was "ancillary" to a prospective injunction because the "prospective" injunction had been moot for three years before the Court of Appeals fashioned the notice relief and for five years before this Court approved it—Congress abolished the federal program at issue in *Quern* in 1974.

By way of explication, the Court retreats to the position that federal courts may grant relief prospectively, that is, against ongoing and future violations of federal law, but not retroactively, that is, against past violations of federal law. Basically what the Court is doing, as it admits in this case, is balancing the Eleventh Amendment and the Supremacy Clause. *Ante*, at 68. If relief is sought against continuing violations, the Court finds that the Supremacy Clause outweighs the Eleventh Amendment; but if relief is requested against past violations, the Court determines that the Eleventh Amendment outweighs the Supremacy Clause. The Court cites no constitutional authority for this balancing test and has not offered, and I suspect cannot offer, a satisfactory analytical foundation for it.

Furthermore, I strenuously disagree with the Court's suggestion that the balance it has struck sufficiently protects the supremacy of federal law. It may be true that the availability of prospective relief of the sort awarded in *Ex parte Young*, 209 U. S. 123 (1908), gives, as the Court puts it, some "life" to the Supremacy Clause. *Ante*, at 68. That this rule saves the Clause from being completely moribund does not, however, alter the reality that it is insufficient to ensure that federal law is paramount. From this day forward, at least with regard to welfare programs, States may refuse to follow federal law with impunity, secure in the knowledge that all they need do to immunize themselves from accountability in federal courts is to conform their policies to federal law on the eve of judgment in a suit brought to secure "prospective" injunctive relief. During the period of noncompliance, States save money by not paying benefits according to the criteria established by federal law,[3] while needy individuals desig-

---

[3] AFDC is a matching benefits program. States pay up to 50 percent of their benefit payments, the Federal Government pays the remainder. House Committee on Ways and Means, Background Material and Data on Programs within the Jurisdiction of the Committee on Ways and Means, 98th Cong., 2d Sess., 292 (Comm. Print 1984).

nated by Congress as the beneficiaries of welfare programs are cheated of their federal rights. Once again, the Court's doctrine "require[s] the federal courts to protect States that violate federal law from the legal consequences of their conduct." *Atascadero*, 473 U. S., at 258. Surely the Supremacy Clause requires a different result.

The foregoing reveals the fundamental incoherence of the Court's Eleventh Amendment jurisprudence. Before the Court can develop a coherent Eleventh Amendment doctrine, I believe that it must reassess a long line of our precedents, beginning with *Hans* v. *Louisiana*, 134 U. S. 1 (1890), and culminating in today's decision, that have perpetuated an erroneous interpretation of the Eleventh Amendment. As I demonstrated in *Atascadero, supra*, the Court's constitutional doctrine of the sovereign immunity of States rests on a mistaken historical premise. Because I treated the subject exhaustively in that case, I will only restate my conclusions here. Recent scholarship indicates that the Framers never intended to constitutionalize the doctrine of state sovereign immunity; consequently the Eleventh Amendment was not an effort to reestablish, after *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), a limitation on federal judicial power contained in Article III. Nor, given the limited terms and context in which the Eleventh Amendment was drafted, could the Amendment's narrow and technical language be understood to have instituted a broad new limitation on the federal judicial power in cases "arising under" federal law whenever an individual attempts to sue a State. *Atascadero*, 473 U. S., at 258–259. Rather, as the historical records and the language of the Constitution reveal, the Amendment was intended simply to remove federal-court jurisdiction over suits against a State where the basis for jurisdiction was that the plaintiff was a citizen of another State or an alien—suits which result in the abrogation of the *state* law of sovereign immunity in *state-law* causes of action. *Id.*, at 259–280.

Because the disputes in the instant case are between citizens and their own State and because a federal question is the source of federal-court jurisdiction, the Eleventh Amendment, properly construed, is no bar to petitioners' suits.

I respectfully dissent.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

I concur in JUSTICE BRENNAN's and JUSTICE BLACKMUN's dissents. I contribute to this proliferation of opinions only to add a few words as to why, even under the view of the Eleventh Amendment accepted by the majority in *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234 (1985), the majority reaches an incorrect result in this case.

I

JUSTICE BRENNAN's opinion cogently explains how the decision of the majority today repudiates *Quern* v. *Jordan*, 440 U. S. 332 (1979). The Court in that case did not approve notice relief as a "mere case-management device," *ante*, at 71, nor does the majority suggest how informing class members of state administrative procedures serves a case-management function in federal-court litigation. Rather, the *Quern* Court, explicitly posing the question whether "the modified notice contemplated by the Seventh Circuit constitute[s] permissible prospective relief or a 'retroactive award which requires the payment of funds from the state treasury,'" concluded that "this relief falls on the *Ex parte Young* side of the Eleventh Amendment line rather than on the *Edelman* side." *Quern, supra,* at 346–347.

II

In abandoning the result it reached six years ago, the majority misapplies its own Eleventh Amendment jurisprudence. The majority states that there are two kinds of remedies that can be sought against a state officer: prospective relief "designed to end a continuing violation of federal law,"

and retrospective relief serving mere "compensatory or deterrence interests." *Ante*, at 68. Only in the former class of relief, it concludes, do the federal interests involved outweigh the Eleventh Amendment interests implicated by a suit against a state officer in his official capacity.\* "Prospective" and "retrospective" labels, however, should be irrelevant to analysis of this case. The notice relief at issue here imposes no significant costs on the State, creates no direct liabilities against the State, and respects the institutions of state government. See *Quern, supra,* at 347–348. This Court has never held that the Eleventh Amendment poses any bar to such relief. Indeed, notice of the availability of possible relief through existing state administrative remedies, where the state agency and state courts would be the sole arbiters of what relief would be granted, assists in the vindication of state law by informing class members that they may have causes of action under that law. In the Eleventh Amendment balance set up by the majority opinion, it is thus hard to see what weight, if any, exists on the State's side of the scale, and why that weight should overcome the interest in vindicating federal law.

---

\*The distinction is hardly so neat as the majority implies. The majority cites *Milliken* v. *Bradley*, 433 U. S. 267 (1977), as exemplifying permissible injunctive relief. *Ante*, at 68. That case involved a continuing federal duty to remedy the effects of past *de jure* segregation; the Court upheld against Eleventh Amendment attack an order that state officials pay costs attributable to a program "designed . . . to restore the schoolchildren of Detroit to the position they would have enjoyed absent constitutional violations by state and local officials," 433 U. S., at 281, characterizing the relief both as "prospectiv[e]" and as "compensatory," *id.*, at 290. Yet petitioners here note that Congress has imposed on state agencies a continuing federal duty to "take all necessary steps to correct any . . . underpayment of aid under the State plan." 42 U. S. C. § 602(a)(22); see also 45 CFR § 205.10(a) (1984). The relief in this case too might therefore be described as related to a continuing federal duty, "part of a plan that operates *prospectively* to bring about the delayed benefits of a [constitutionally administered program]." *Milliken, supra,* at 290 (emphasis in original).

I would hold that whether the Eleventh Amendment was intended simply to provide that a State cannot be sued in federal court where the basis of jurisdiction is that the plaintiff is a citizen of another State or an alien (as I believe), or was intended to constitutionalize a much broader principle of state sovereign immunity (as the majority believes), there is simply nothing offensive to that Amendment in an order that the State notify class members of the possibility that they may be entitled to relief through the state administrative process. Because that order neither imposes significant costs on the State nor creates any direct liabilities against it, the *Quern* Court properly placed it "on the *Ex parte Young* side of the Eleventh Amendment line." 440 U. S., at 347.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

I joined JUSTICE BRENNAN's dissent in *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 247 (1985), and I join his dissent in this case. I fully agree that the Court's Eleventh Amendment approach, as demonstrated by the difference between the result in this case and that in *Quern* v. *Jordan,* 440 U. S. 332 (1979), is sterile, produces inconsistent decisions, and is in serious need of reconsideration. Cf. *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 539, 546–547 (1985).

But I also would reverse the judgment of the Court of Appeals in this case for the additional reason expressed in my dissent (joined by JUSTICES BRENNAN, MARSHALL, and STEVENS) in *Atascadero,* 473 U. S., at 302, namely, the waiver by Michigan, "as a willing recipient of federal funds," *id.,* at 304, of any Eleventh Amendment barrier that otherwise might exist. The State too easily avoids its responsibilities, and the Court by its decision today allows the State to go its way unimpeded and unburdened with any remedy for those who have been wronged during the period of Michigan's noncompliance with federal law.