**Terri Lee HALDERMAN,
et al., Plaintiffs,**

v.

**PENNHURST STATE SCHOOL AND
HOSPITAL, et al., Defendants.**

**Civ. A. No. 74–1345.**

United States District Court,
E.D. Pennsylvania.

Aug. 17, 1993.

---

758

David Ferleger, Philadelphia, PA, for plaintiffs.

Thomas Gilhool, Harrisburg, PA, for Pennsylvania Ass'n for Retarded Citizens, Moskowitz, Hight and DiNolfi.

Norman J. Watkins, Deputy Atty. Gen., Dept. of Justice, Harrisburg, PA, for defendants.

Peter A. Glascott, James M. McNamara, Asst. City Sol., Doylestown, PA, for County of Bucks, George Metzer, Roger Bowers, Joseph Catania, Peter Bodenheimer.

Robert DeLuca, U.S. Atty., and Walter Batty, J. Stanley Pottinger, Asst. Atty. Gen., Civ. Rights Div., U.S. Dept. of Justice, Arthur Peabody, Washington, DC, for U.S.

Frank, Margolis, Edelstein & Scherlis, Joseph Goldberg, Philadelphia, PA, for Margaret Green, Betty Uphold, Alice Barton, P.E. Klick, Dr. Parocca and Helen Francis.

Thomas Kittredge, Philadelphia, PA, Patricia H. Jenkins, Media, PA, for Faith Whittlesey, Char. Keeler, Wm. Spingler, Comm. of Delaware Cty., P.P. Burrichter-Del. Cty.

Joseph M. Davidson, Marc H. Myers, Howland W. Abramson, Asst. City Solicitors, for Mayor Frank L. Rizzo.

Stephen A. Sheller, P.C., Philadelphia, PA, for Eric Cohen, et al.

Thomas F. Schilpp, Luchsinger, Schilpp, Murphy & Noel, Media, PA, for Commissioners of County of Delaware and Paul Burrichter, Admin.

Paul Sacks, Asst. City Sol., Philadelphia, PA, for Mayor Frank L. Rizzo, City Council of Philadelphia and Leon Soffer.

Roger M. Reynolds, Mont. County Sol., Ward A. Cotton, Sol., Montgomery, Joseph A. Smyth, Asst. Mont. County Sol., Norristown, PA, for A. Russell Parkhouse, Frank W. Jenkins, Lawrence H. Curry, Mont. County Comm., and Hermann A. Roether.

Jeffrey Cooper, Deputy Atty. Gen., Dept. of Justice, Harrisburg, PA, for Pennhurst State School & Hosp., Dept. of Public Welfare, Frank S. Beal, Stanley Meyers, Aldo Colautti, Wilbur Hobbs, Russell Rice, Jr. and C. Duane Youngberg.

Joseph P. Green, Jr., Montgomery County Legal Aid, Norristown, PA, for W.P. and R.G.

John Rogers Carroll, Philadelphia, PA, for Patricia Jenkins.

Larry Goldberg, Washington, DC, for U.S.

Thomas M. Kittredge, Philadelphia, PA, for Montgomery County and Bucks County defendants.

Steven M. Coren, Philadelphia, PA, for W.M. and B.M. (Parents of P.M.).

Edward Blumstein, Philadelphia, PA, for Parents of J.B.N.

Robert O. Baldi, New Hope, PA, for Dorothy Klock, John Klock and Sall Klock–Ward.

John F. Stoviak, Philadelphia, PA, for Cynthia J. Colona, and Her Parents Mr. & Mrs. William Colona.

Ilene W. Shane, Philadelphia, PA, for C.C.

Alan Held, Civil Rights Div., Washington, DC, for U.S.

Joseph M. Davidson, Asst. City Sol., Marc H. Myers, Asst. City Sol., Philadelphia, PA, for Mayor F.L. Rizzo, City Council of Philadelphia and Leon Soffer.

Pamela P. Cohen, Sandra Swenson, Philadelphia, PA, for Intervention Pennhurst Parents–Staff Ass'n.

Richard Kirschner, Kirschner, Walters & Willig, Philadelphia, PA, for Intervention, Council 13, American Federation of State, County & Mun. Employees, AFL–CIO.

Adjoa A. Burrow, U.S. Dept. of Justice, Civ. Rights Div., Sp. Litigation Section, Washington, DC, for U.S.

James C. Everett, Philadelphia Ass'n for Retarded Citizens, Philadelphia, PA, for R.M., Parents of D.M.

Herbert B. Newberg, Philadelphia, PA, for plaintiffs Parents and Family Assoc. of Pennhurst, et al.

Larry J. Goldberg, Civil Rights Div., Washington, DC, for U.S.

Dennis E. Haggerty, Philadelphia, PA, for R.S. Parent and Court–Appointed Guardian of D.S.

Robert W. Lentz, Paoli, PA, for Kimberly Carol Lentz and Nancy Ann Macbeth.

Edmund A. Tiryak, Andrew F. Erba, Community Legal Services, Inc., Philadelphia, PA, for Daniel B.

Peter A. Galante, Philadelphia, PA, for Catherine Devitt.

### *MEMORANDUM*

RAYMOND J. BRODERICK, District Judge.

In 1974, this action was filed on behalf of the retarded residents of Pennhurst State School and Hospital asserting violations of their constitutional and statutory rights. After eleven years of active litigation including approximately 500 court orders, 28 published opinions and three arguments before the Supreme Court, the parties entered into a Final Settlement Agreement ("FSA") which was approved and entered as a consent decree and Order of this Court ("Court Decree") on April 5, 1985. Nevertheless, in the eight years following the entrance of the Court Decree, the plaintiffs have been forced to file several motions for enforcement, necessitated by the actions of the defendants.

In response to one such motion, filed in 1989, the Commonwealth defendants contended that the Court Decree embodied only moral, and not legal, obligations and was unenforceable against them. This Court determined, and the Third Circuit affirmed, that defendants' contentions were meritless. *Halderman v. Pennhurst State School and Hospital,* No. 74–1345, 1989 WL 100207, 1989 U.S. Dist. LEXIS 10147 (E.D.Pa. Aug. 28, 1989), *aff'd, Halderman v. Pennhurst State School and Hospital,* 901 F.2d 311 (3rd Cir.), *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). In 1991, the Commonwealth defendants filed their own motion, this time contending that, due to alleged changes in constitutional and statutory law, the Court Decree should be modified, making it unenforceable against them. Again this Court determined, and the Third Circuit affirmed, that defendants' contentions were meritless. *Halderman v. Pennhurst State School and Hospital,* 784 F.Supp. 215 (E.D.Pa.), *aff'd,* 977 F.2d 568 (3rd Cir.1992).

Now, within 8 months of the Third Circuit's rejection of the meritless contentions of the Commonwealth defendants' 1991 motion, they have filed another motion. In their present motion, the defendants assert that all plaintiffs except the United States should be dismissed from this action based on alleged eleventh amendment claims. This Court notes that dismissal of all plaintiffs except the United States would remove those parties directly affected by the actions of the Commonwealth defendants, leaving only the United States as a party capable of bringing enforcement actions.

Having determined that the Commonwealth defendants' present contention has no more merit than those they raised in 1989 or in 1991, this Court will deny the Commonwealth defendants' motion. In doing so, this Court again, as it did in its 1992 opinion, expresses its dismay that the Commonwealth defendants' motion appears to have been an attempt at delaying full compliance with the Court Decree into which they knowingly and willingly entered in 1985.

The history of the proceedings in this case is lengthy and is set out in summary in this Court's 1992 opinion, which was filed in response to the Commonwealth defendants' 1991 motion. *Halderman,* 784 F.Supp. 215, (E.D.Pa.), *aff'd,* 977 F.2d 568 (3rd Cir.1992). The proceedings will not be repeated herein except as needed for an understanding of the present posture of this case. In May of 1974, suit was brought as a class action on behalf of former and present residents of Pennhurst State School and Hospital, a state institution for persons with retardation in Spring City, Pennsylvania, against various officials of the

Commonwealth of Pennsylvania including those of the Pennhurst State School and Hospital and the Department of Public Welfare. In 1975, the Pennsylvania Association for Retarded Citizens (now ARC/PA), among others, intervened as plaintiffs, adding as defendants the Mental Health/Mental Retardation Administrators of Bucks, Chester, Delaware, Montgomery and Philadelphia Counties. Also in 1975, the United States of America intervened as a party plaintiff. In November, 1976, the class was certified. The definition of class was amended in 1985, pursuant to the Court Decree, to include only those who were residents of Pennhurst on or after May 30, 1974.

In 1977, after a 32–day trial limited to the issue of liability, this Court made findings of fact and concluded that certain constitutional and statutory rights of the Pennhurst class had been and were being violated. *Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295 (1977). A summary of this procedural history which followed may be found in this Court's 1985 opinion, *Halderman,* 610 F.Supp. 1221, 1225–26 (E.D.Pa. 1985). In brief, the defendants appealed to the Third Circuit Court of Appeals, and then to the Supreme Court. On remand from the Supreme Court, the Third Circuit affirmed on different grounds. On appeal, the Supreme Court heard two oral arguments and remanded once again. Throughout, the findings of fact made by this Court in 1977 were never challenged. Among those findings were that Pennhurst was overcrowded, understaffed and without the programs which experts considered necessary for minimally adequate habilitation. (Habilitation is the term of art used to refer to that education, training and care required by retarded individuals to reach their maximum development.) The evidence clearly showed that,, in many instances, life skills that had been possessed by the residents at the time of their admission had been destroyed.

The evidence further showed that the residents of Pennhurst were regularly subjected to a number of dehumanizing practices, including restraints and psychotropic drugs being used as control measures in lieu of adequate staffing. There were hundreds of resident injuries, both major and minor, reported each month, including some reports of beatings and rapes of the residents by staff. As a direct result of abuse, many residents suffered loss of teeth, broken bones, and physical deterioration. Pennhurst was isolated and segregated, with few of the retarded capable of aiding or protecting their fellow residents, or of complaining about their own treatment. Moreover, because routine housekeeping services were not available during evenings and on weekends, it was common to find urine and feces on ward floors over these periods. The average age of the residents was 36, and the average stay at Pennhurst was 21 years.

Following the final remand from the Supreme Court and while the case was pending before the Third Circuit, the Commonwealth and the County defendants chose to end active litigation and to enter into the FSA with the plaintiffs under the guidance of Judge Rosenn of the Third Circuit Court of Appeals. As stated above, the definition of the plaintiff class was limited to those persons who were residents of Pennhurst on or after May 30, 1974.

This Court reviewed and approved the FSA, and entered it as a Court Decree and Order of this Court on April 5, 1985. *Halderman v. Pennhurst State School and Hospital,* 610 F.Supp. 1221 (E.D.Pa.1985).

As summarized in this Court's 1992 opinion, *Halderman,* 784 F.Supp. at 217–18, the FSA has four components. The main body of the FSA consists of 22 paragraphs and a glossary of terms. Appendix A is the "heart and soul" of the FSA, and sets forth the substantive services, safeguards and monitoring which the Commonwealth and County defendants agreed to provide each class member. Appendix A is quoted in full in this Court's 1992 opinion, *Halderman,* 784 F.Supp. at 218–19. Under its terms, the Commonwealth and County defendants agreed, among other things, to provide community living arrangements to each member of the plaintiff class for whom such placement is deemed appropriate, as determined by professional judgment through the individual planning process, together with such community services as are necessary to pro-

vide each person with minimally adequate habilitation until such time as the person no longer is in need of such living arrangements and/or community services.

Of the remaining two components of the FSA, Appendix B sets forth the Commonwealth's obligations with respect to allocation of the funds made available by the closure of Pennhurst, while Appendix C concerns the approval of the FSA and notice to members of the Pennhurst class.

Pennhurst State School and Hospital was at last closed in 1987. Litigation in this matter, nevertheless, has continued. As stated above, the actions of the defendants have necessitated the filing of several motions by the plaintiffs for enforcement of the Court Decree. As also stated above, in 1989, in response to one such motion filed by ARC/PA, the Commonwealth defendants asserted that the defendants had moral, but not legal, obligations to the members of the Pennhurst class and further, that this Court was without jurisdiction to enforce the Court Decree. This Court, after holding hearings over a period of four days, found that it had jurisdiction and that the defendants in entering into the Court Decree had assumed legal obligations to the Pennhurst class. Further, the Court found that the Commonwealth defendants as well as two of the county defendants were not in substantial compliance with the provisions of the Court Decree and the judgments entered by this Court, in that significant members of the Pennhurst class were still not receiving minimally adequate habilitation. *Halderman v. Pennhurst School and Hospital,* No. 74–1345, 1989 WL 100207, 1989 U.S. Dist. LEXIS 10147 (E.D.Pa. Aug. 28, 1989), *aff'd, Halderman v. Pennhurst School and Hospital,* 901 F.2d 311 (3rd Cir.), *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). Affirming, the Third Circuit determined that, following the entry of the Court Decree, jurisdiction over this matter by the district court remained, pursuant to "the usual continuing jurisdiction that courts routinely exercise over their injunctions." *Id.* at 320. The Third Circuit further determined that Appendix A obligations were "orders of the Court" and not ethical commands. *Id.* at 319–20. Appendix A, thus, was determined to be "permanent" subject to Rule 60(b). The Commonwealth defendants were held to have a continuing legal obligation to the Pennhurst class.

In 1991, the Commonwealth defendants made another attempt to avoid the legal obligations they knowingly assumed when they entered into the Court Decree. This time, the Commonwealth defendants filed a motion in which they asserted that Appendix A, the "heart and soul" of the Court Decree, should be vacated. They claimed that, subsequent to the entry of the Court Decree, the legal predicates for Appendix A had been undermined by developments in constitutional substantive due process and equal protection law and in federal statutory rights under Section 504 of the Rehabilitative Act of 1973, 29 U.S.C. § 794. The Commonwealth defendants also asserted that vacation of Appendix A was supported by equity and fairness.

Guided by the then-recent Supreme Court decision, *Rufo v. Inmates of Suffolk County Jail,* — U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), this Court determined that the Commonwealth defendants, as the party seeking modification of an institutional reform consent decree, had failed to carry their burden of establishing that significant change in factual conditions or law warranted revision of the Court Decree. The Commonwealth defendants had based their assertion of changes in constitutional substantive due process on cases holding that voluntary residents had no constitutional right to mental retardation services. This Court in 1977, however, had made a finding of fact based on 32 days of testimony that the residents of Pennhurst were involuntary. Recent caselaw, including *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), supported that finding: the Commonwealth defendants had affirmatively acted in accepting the residents into Pennhurst, in restraining them at Pennhurst, and in depriving them of their constitutional right to minimally adequate habilitation, a failure that could well have meant commitment for life, since it was unlikely that they would ever advance to a stage at which they might be

found ready by the staff to go out into the community. As the Supreme Court in *DeShaney*, at 199, 109 S.Ct. at 1005, stated:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. . . . *In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause*, . . . .

In their 1991 motion to vacate Appendix A, the Commonwealth defendants also asserted that the equal protection predicate on which the Court Decree was based had been undermined by the rational basis standard enunciated by the Supreme Court in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The right to relief found by this Court in 1977, however, had not stemmed from suspect or quasi-suspect class analysis. Further, the obligations which the Commonwealth defendants were attempting to avoid had not come from the Court's 1977 opinion, but had come instead from the FSA into which the Commonwealth defendants had knowingly and willingly entered after active negotiation.

As to the Commonwealth defendants' assertion that the Section 504 right to relief found by this Court in its 1977 opinion had been undermined, the defendants cited a footnote in the Third Circuit decision of *Clark v. Cohen*, 794 F.2d 79, 84 n. 3 (3rd Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). In *Clark*, however, the Third Circuit had not addressed Clark's Section 504 claim because the lower court had found that she had failed to prove that she was discriminated against solely on the basis of her handicap. In the footnote

relied upon by defendants, the Third Circuit had stated simply that Section 504 "prohibits discrimination against the handicapped in federally funded programs. It imposes no affirmative obligations on the states to furnish services." *Id.*

In 1977, however, this Court had specifically found a violation under Section 504 of the federal statutory right of the Pennhurst residents to habilitation in a non-discriminatory manner. Further, this Court noted in its 1992 opinion, *Halderman*, 784 F.Supp. at 224, that Congress, in enacting the Americans with Disabilities Act of 1990, had affirmed that Section 504 prohibits unnecessary segregation and requires reasonable accommodations to provide opportunities for integration. Congress also extended protection to include all state and local programs, regardless of the receipt of federal assistance.

The Commonwealth defendants' final assertion in their 1991 motion was that equity and fairness supported vacating Appendix A. However, as this Court noted in its 1992 opinion, the Commonwealth defendants had still not complied fully with the Court Decree: as of November of 1991—six years after defendants chose to enter into the Court Decree—fifteen members of the Pennhurst class had not received appropriate placement. Because vacation of Appendix A would eviscerate the Court Decree, and because the defendants had knowingly and willingly chosen to enter into it after eleven years of active litigation, this Court determined that no considerations of equity and fairness supported defendants' motion. Further, as stated heretofore, this Court expressed its dismay that, having determined that there had been no change in law or fact supporting the Commonwealth defendants' motion, the Court had reached the conclusion that the motion had been yet another attempt by defendants to avoid, or at least to delay, full compliance with the Court Decree.

On September 11, 1992, in a not-for-publication opinion of two and one-half pages, the Third Circuit affirmed. *Halderman v. Pennhurst State School and Hospital*, No. 92–1186 [977 F.2d 568 (Table) ] (3rd Cir., Sept. 11, 1992). As to their constitutional substan-

tive due process assertions, the Commonwealth defendants had contended on appeal that *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and its progeny had altered the obligations which a state owes to the mentally retarded. The Third Circuit stated that the Commonwealth defendants read *DeShaney* far too expansively, in that *DeShaney* had not involved the rights of those in institutions, and had not eliminated the state's obligations under *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), to provide prospective remedies for inadequate institutional care. The Third Circuit held that, because the law underlying the substantive due process analysis had not changed, it would not reach the Commonwealth defendants' arguments as to equal protection and Section 504. The Third Circuit stated, however, that it was unpersuaded by the Commonwealth's assertion that equity required the vacation of Appendix A.

Having failed in 1989 and again in 1991 in their attempts to avoid the legal obligations they knowingly assumed in 1985 by their acceptance of the Court Decree, the Commonwealth defendants have filed yet another motion. Asserting Eleventh Amendment immunity, the defendants now seek dismissal of all plaintiffs except the United States. Although defendants insist that during the extended litigation in this matter they have not waived the Eleventh Amendment issue they now raise, it would appear to this Court that the Commonwealth defendants, in entering into the Court Decree, have "unequivocally expressed" their consent both to suit and to be bound by the Court Decree. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (a State may waive sovereign immunity and consent to suit against it in federal court, but the consent must be unequivocally expressed). It would appear to this Court that, in entering into the Court Decree in 1985, the Commonwealth defendants waived any entitlement to raise Eleventh Amendment immunity to enforcement of that Decree. *See Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989) (by entering into the consent decree, the New York State Department of Correctional Services Commissioner waived eleventh amendment immunity). Nevertheless, this Court will address their present argument.

In their 1993 motion, the Commonwealth defendants insist that dismissal of all plaintiffs except the United States is required by the Supreme Court's recent opinion, *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* —— U.S. ——, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). They insist that dismissal of all plaintiffs except the United States would not change the obligations of the Commonwealth defendants under Appendix A but would merely permit enforcement actions to be brought only by the United States, with the class members becoming intended beneficiaries. As this Court noted above, dismissal of plaintiffs except the United States parties would remove those parties who have been most active in seeking to enforce compliance with the Court Decree.

The Commonwealth defendants assert that any prior uncertainty in Eleventh Amendment law in distinguishing between permitted prospective relief and prohibited retrospective, or compensatory, relief has now been clarified by the Supreme Court in *Puerto Rico Aqueduct,* at ——, 113 S.Ct. at 688. Asserting that a "bright line" has been established by *Puerto Rico Aqueduct,* they contend that Appendix A has been transformed from permitted prospective relief into prohibited compensatory relief. The Commonwealth defendants base this alleged transformation on a statement by the Third Circuit in its unpublished 1992 opinion, *Halderman,* No. 92–1186 (Sept. 11, 1992), which defendants interpret as holding that Appendix A is a remedy for inadequate institutional care in the past. The Commonwealth defendants argue that, with the closing of Pennhurst in 1987, there were no further ongoing constitutional violations. They argue further that the Pennhurst class did not take their substantive due process rights to care with them upon their release from Pennhurst. They conclude that under *Puerto Rico Aqueduct,* Appendix A is relief intended to repair past injury and is thus wholly compensatory. Because the Eleventh Amendment bars awards

of compensatory relief to private parties against a state or its officials, the Commonwealth defendants assert that all plaintiffs except the United States must be dismissed.

The present argument of the Commonwealth defendants, like their 1989 and 1991 arguments, is meritless. First, there is nothing in *Puerto Rico Aqueduct* that might possibly be construed as transforming the prospective injunctive relief of the Court Decree into compensatory relief. In *Puerto Rico Aqueduct*, the issue before the Supreme Court was whether a district court order denying a claim of Eleventh Amendment immunity by a state or state entity was an appealable order under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The parties were an autonomous government instrumentality and a private engineering firm with which it had contracted to assist it in the task of upgrading many of its wastewater treatment plants. *Puerto Rico Aqueduct*, thus, was not a suit in which constitutional claims were made and prospective relief to correct ongoing constitutional and statutory deprivations were sought, nor was it a case brought against state officials.

In *Puerto Rico Aqueduct*, the Supreme Court discussed the collateral order doctrine, and then noted that the engineering firm had maintained that the doctrine was inapplicable because the Eleventh Amendment did not confer immunity from suit but was merely a defense to liability. The Supreme Court, *id.*, —— U.S. at ——, 113 S.Ct. at 688, stated:

Support for this narrow view of the Eleventh Amendment is drawn mainly from *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441 [52 L.Ed. 714] (1908), under which suits seeking prospective, but not compensatory or other retrospective relief, may be brought against state officials in federal court challenging the constitutionality of official conduct enforcing state law.

The Supreme Court then proceeded to review the doctrine of *Ex parte Young*. Quoted in full, the Supreme Court stated:

The doctrine of *Ex parte Young*, which ensures that state officials do not employ the Eleventh Amendment as a means of

avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity. *See, e.g., Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985). Moreover, the exception is narrow: it applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, *id.*, at 73, 106 S.Ct. at 428, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought. *Cory v. White*, [457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982)]. Rather than defining the nature of Eleventh Amendment immunity, *Young* and its progeny render the Amendment wholly inapplicable to a certain class of suits. Such suits are deemed to be against officials and not the States or their agencies, which retain their immunity against all suits in federal court.

In the whole of *Puerto Rico Aqueduct*, there are no further references to prospective and retrospective relief. Contrary to the assertion of the Commonwealth defendants, there is nothing in *Puerto Rico Aqueduct* that can be construed as mandating that the permitted prospective relief which they agreed to provide in entering into the Court Decree has now been transformed into prohibited compensatory relief.

Nevertheless, the Commonwealth defendants assert that, under their "bright line" theory, Appendix A has now become compensatory based on their interpretation of a sentence of the Third Circuit in its unpublished 1992 opinion, *Halderman*, No. 92–1186 (3rd Cir., Sept. 11, 1992). The statement of the Third Circuit, slip op. at 4, on which the defendants hinge their argument, quoted in full, is:

We agree with the Court's holding in *Thomas S. ex rel. Brooks v. Flaherty*, 902 F.2d 250, 253–55 (4th Cir.) [*cert. denied*, 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990)], that *DeShaney* did not eliminate the state's obligations under *Youngberg v. Romeo*, 457 U.S. 307 [102 S.Ct. 2452, 73 L.Ed.2d 28] (1982), to provide prospective remedies for inadequate institutional care.

Defendants assert that the above-quoted statement of the Third Circuit is a holding that Appendix A is a remedy for inadequate institutional care in the past. Defendants' assertion is absurd.

As stated heretofore, in *Halderman,* No. 92–1186 (3rd Cir., Sept. 11, 1992), the Third Circuit affirmed this Court's determination that no changes in constitutional substantive due process analysis nor equitable considerations supported the Commonwealth defendants' assertion that Appendix A should be vacated. The defendants had argued on appeal that *DeShaney,* 489 U.S. 189, 109 S.Ct. 998 (1989), and its progeny had altered the obligations which a state owes to the mentally retarded. The Third Circuit responded, stating that *DeShaney* did not involve the rights of those in institutions but instead, dealt with a state's obligations when it did not have institutional control over a child. The Third Circuit stated that it agreed with the Fourth Circuit's holding in *Thomas S.,* 902 F.2d at 253–55, that *DeShaney* did not eliminate the state's obligations under *Youngberg* to provide prospective remedies for inadequate institutional care.

*Youngberg* was brought by a mother as next friend of her mentally retarded son, Nicholas Romeo, who had been involuntarily committed at Pennhurst. A member of the Pennhurst class action before this judge, Romeo had not requested injunctive relief in his separate suit before another judge of this court. In *Youngberg,* the Supreme Court held that Romeo had a Fourteenth Amendment right to safe conditions, *id.,* 457 U.S. at 315, 102 S.Ct. at 2458; to freedom from bodily restraint, *id.* at 316, 102 S.Ct. at 2458; and, in view of the relief asserted by Romeo, to minimally adequate habilitation related to these needs, *id.* at 319, 102 S.Ct. at 2460.

In *Thomas S.,* a class of mentally retarded adults in public psychiatric hospitals in North Carolina sued the Secretary of North Carolina Department of Human Resources. After a bench trial, the district court ordered injunctive relief. On appeal, the Secretary argued, among other things, that persons who were no longer in state custody had no substantive due process rights to minimally adequate treatment and thus should not have been included in the district court's order. The Fourth Circuit, *Thomas S.,* 902 F.2d at 254–55, in discussing *DeShaney,* stated:

> *DeShaney* does not support the proposition that persons who were in state custody at the time of class certification and later released have no right to a remedy.... Here all members of the class were institutionalized patients on the date of certification.... The district court sought to remedy the harm suffered by class members whether they remained in the institution or had been discharged. The object of the court's order is twofold: to ameliorate the lingering effects, if any, of improper treatment; and to remedy inappropriate community placements, if any.... *We believe that the state's duty to render the kind of treatment prescribed by Youngberg is not discharged by simply releasing a class member from the institution where he or she had been hospitalized.* Otherwise the state could unilaterally avoid the obligations imposed by *Youngberg* and defeat the claims of class members by terminating their institutional care while the case was pending.

*Thomas S.,* 902 F.2d at 254–55 (citations omitted) (emphasis added.)

The Third Circuit's statement on which the Commonwealth defendants base their argument, repeated for convenience, is:

> We agree with the Court's holding in *Thomas S. ex rel. Brooks v. Flaherty,* 902 F.2d 250, 253–55 (4th Cir.) [*cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990) ], that *DeShaney* did not eliminate the state's obligations under *Youngberg v. Romeo,* 457 U.S. 307 [102 S.Ct. 2452, 73 L.Ed.2d 28] (1982), to provide prospective remedies for inadequate institutional care.

Contrary to the Commonwealth defendants' contention, the Third Circuit in the above-quoted statement did not hold that Appendix A was a remedy for inadequate institutional care in the past. Rather, in light of the cases cited, the Third Circuit said that, for the purpose of the relief mandated in Appendix A, the release of the Pennhurst plaintiffs from Pennhurst did not bring them within the ambit of *DeShaney.* Rather, ac-

cording to the Third Circuit, they remained within the ambit of *Youngberg.* That is, the Commonwealth's obligations to correct the constitutional violations that were being suffered by the Pennhurst plaintiffs were not eliminated simply by their release from Pennhurst.

The contention of the Commonwealth defendants that, because Pennhurst has been closed, the Pennhurst plaintiffs do not presently enjoy substantive due process rights to care is plainly contrary to the statement of the Third Circuit on which they rely. Neither the constitutional rights nor the constitutional violations which this Court found in 1977 ended with the closing of Pennhurst. More to the point, however, is the fact that the relief to which the Pennhurst plaintiffs are entitled arises directly from the Court Decree into which the defendants voluntarily chose to enter in 1985.

As discussed above, the actions of the Commonwealth defendants have necessitated repeated motions by the plaintiffs for enforcement of Appendix A. In 1993, full compliance is still a goal. This Court notes that, in an attempt to resolve pending motions by the plaintiffs to hold the Commonwealth and Philadelphia defendants in contempt of the Court Decree, those defendants chose to enter into a stipulated agreement with the ARC/PA and Halderman plaintiffs, pursuant to which the Commonwealth and Philadelphia defendants agreed to formulate and file with this Court their collaborative plan to address the continuing violations of the Court Decree. The stipulated agreement was entered as an Order of this Court on August 19, 1991. This collaborative plan was at last filed on July 8, 1993—three months *after* the Commonwealth defendants filed their present motion to dismiss all non-United States parties from this suit.

In 1985, it was hoped that the entry of the Court Decree as an Order of this Court would bring an end to eleven years of litigation in this matter. It saddens this Court to note that, although the Commonwealth defendants have yet to fully comply with the Court Decree, they have nevertheless chosen to continue litigation an additional eight years, now with a meritless assertion that the Court Decree is a remedy for "past" constitutional violations.

As the Supreme Court stated in *Papasan v. Allain,* 478 U.S. 265, 277, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986):

> *Young*'s applicability has been tailored to conform as precisely as possible to those specific situations in which it is "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States."

*Id.* (quoting *Pennhurst State School and Hospital v. Halderman,* 465 U.S. at 105, 104 S.Ct. at 910) (internal quotation marks omitted).

With full compliance remaining at issue eight years after the entry of the FSA, this Court has no doubt that this is such a case.

## ORDER

AND NOW, this 16th day of August, 1993; the Commonwealth defendants having filed a motion to dismiss all non-United States plaintiffs from this action; for the reasons set forth in this Court's Memorandum of August 16th, 1993;

IT IS ORDERED: the motion of the Commonwealth defendants to dismiss all non-United States plaintiffs is DENIED.